NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| _____ : | | |
| ARVIND WALIA, | : | |
| | : | Civil Action No. 07-5541 (PGS) |
| | : | |
| Plaintiff-Appellee, | : | |
| v. | : | **OPINION** |
| | : | |
| RABINDER SINGH, et als. | : | |
| | : | |
| Defendants-Appellants. | : | |
| _____: | | |

**<u>SHERIDAN,  U.S.D.J.</u>**

      This bankruptcy matter comes before the Court on an appeal of a July 26, 2005 Order and Opinion issued by The Honorable Donald H. Steckroth, U.S.B.J. (the "First Opinion"), which became final by virtue of a subsequent Order and Opinion dated October 4, 2007 (the "Second Opinion").  Appellants Rabinder Singh and Navneet K. Riar ("Debtor") allege that the Bankruptcy Court erred for several reasons including not granting Appellants' motion to dismiss for Plaintiff's lack of standing; by failing to dismiss Plaintiff's complaint regardless of his creditor status (secured or unsecured); and instead substituting the Chapter 7 Trustee for Walia as the proper party in the contested matter and equitably tolling the statute of limitations so that the Chapter 7 trustee could contest an alleged fraudulent conveyance from Singh to Riar.  For the reasons set forth below, the appeal is denied.

I.

The Court adopts the facts as found by Bankruptcy Judge Steckroth in his Second Opinion (dated October 4, 2007), and sets them forth below verbatim (footnotes included).

1.      In February of 1996, the Debtor and Harbir Riar purchased a gas station with an address of 182 Pennington Avenue, Trenton, New Jersey.

2.      On April 11, 1996, the Debtor and Harbir Riar incorporated RPC under the laws of the state of Delaware to serve as the gas station's operating entity.

3.      The Debtor and Harbir Riar entered into a lease agreement with Getty Petroleum Corporation to operate the gas station.

4.      Both the Debtor and Harbir Riar contributed payment towards the purchase price of the gas station.

5.       The Debtor and Harbir Riar were each 50% shareholders and owners of the gas station.

6.      The Debtor served as the vice president of RPC, while Harbir Riar served as both its president and secretary.

7.      The Debtor and Harbir Riar served as the board of directors of RPC.

8.      Under the terms of the lease agreement, RPC was required to make rental payments to Getty and sell Getty gasoline.

9.      The Debtor and Harbir Riar also received a commission from Getty based on the percentage of gasoline sold. The commission payments were deposited by Getty into a joint account in their names.

10.     In addition to commission checks, both men were paid a monthly salary for their services from the gas station account.

11.     On September 7, 1999, the Debtor and Harbir Riar renewed the lease agreement with Getty on behalf of RPC through January 31, 2003.

12.     The renewed lease agreement was originally drafted in the names of the Debtor and Harbir Riar, but was subsequently executed in the name of RPC. Despite this change, the commission account remained in the names of the Debtor and Harbir Riar.

13.     On April 6, 1998, the Debtor took a loan from V.P. Bindra and pledged his 50% interest in RPC as collateral. The agreement was drafted by Lawrence Chaifetz, Esq.,[1] of whom Bindra was a long-time client.

14.     Collateral for the loan was represented by a stock certificate in the amount of 200 shares, purportedly issued by RPC on April 7, 2006. The Debtor satisfied the agreement with Bindra in 1999, and Bindra's interest in RPC was accordingly released as collateral for the loan.

15.     Walia met the Debtor in 1998. At the time the Debtor owned an interest in multiple businesses including: Garden State Spices, Inc., Biopure Ingredients. Inc., United Poly-met, Inc., and RPC.

16.     In 1999, Walia agreed to operate a second gas station as business partner with the Debtor and transferred $250,000 to the Debtor as a capital investment.

_____

[1]Mr. Chaifetz was served with a subpoena requiring his appearance at trial. Despite the subpoena, Mr. Chaifetz did not appear. This Court stated on the record at trial that it would sign an order compelling his appearance. However, no order was submitted.

17.    At or around the same time, Walia loaned the Debtor $150,000 for use in other businesses operated by the Debtor.

18.    The business plan to operate a second gas station never materialized. Walia demanded repayment of his $400,000. The Debtor refused and responded that he had spent the money.

19.    In June of 1999 the Debtor executed a promissory in favor of Walia under which payment was to be made in two installments for the total amount of $400,000[2] by the end of the year.

20.    The note was not repaid as promised by the Debtor. As a result of non-payment, Walia insisted that the Debtor execute a new set of collateralized loan documents. The Debtor agreed and recommended Mr. Chaifetz conduct the transaction as he had previously brokered and papered the Bindra agreement.

21.    On November 27, 2000, Walia and the Debtor met at Mr. Chaifetz's office and executed documents including: (i) a guaranty of payment, (ii) a UCC-1 financing statement for RPC, (iii) a stock power agreement, and (iv) a purported assignment of the stock certificate previously pledged to V.P. Bindra to Arvind Walia.[3]

22.    After the agreements were signed, the Debtor provided Mr. Chaifetz with a stock certificate representing an ownership interest in RPC. Mr. Chaifetz then advised Walia that the stock certificate was in the attorney's possession.

---

[2]    This figure was later increased to $600,000 in a subsequent transaction. However, the Court does not have before it any proof of tender of the excess $200,000. Therefore, the Court finds that $400,000 was the actual amount loaned.

[3]    Testimony indicates that a previous effort to execute replacement documents disintegrated due to the alleged forgery of Navneet Riar's signature by the Debtor.

4

23.     The November 27, 2000 transaction took place in the State of New York.

24.     At all relevant times, the stock certificate was in the possession of Mr. Chaifetz in the State of New York.

25. Documents including a UCC-1 financing statement reciting Walia's alleged interest in RPC were filed in the State of New Jersey.

26. Walia never saw the RPC stock certificate until after the November 27, 2000 transaction was executed. Instead, he only saw a pile of stock certificates handed to Mr. Chaifetz on that date.

27.     Walia did not conduct any due diligence concerning the Debtor's financial wherewithal to make good on his promises of repayment. In addition, Walia did not conduct any due diligence concerning the validity or value of the assets taken as collateral.

28.     Walia failed to request a formal written acknowledgment from RPC authorizing or ratifying the issuance of the stock certificate.

29.     The stock certificate states that it represents 200 shares in RPC and is dated April 7, 1996.

30.     The transaction constituted the execution of a promissory note by the Debtor, collateralized by, inter alia, an equity interest in RPC.[4]

31.      No stock was ever issued for RPC.

32.     RPC neither sold nor attempted to sell stock to Walia.

---

[4]     The Court expressly stops short of deciding whether the pledge actually constituted the Debtor's full 50% interest in RPC, as alleged, or simply 200 of the 1,500 shares authorized for issuance by RPC as this determination is unnecessary given the Court's legal conclusions.

33.     No valid assignment of shares in RPC or of the Debtor's interest therein was ever accomplished.

34.     The Debtor made only a $7,000[5] payment on the total amount owed to Walia.

35.     The Debtor and Harbir Riar next engaged in a series of transactions to quickly transfer the gas station out of the control of RPC and the Debtor. The purpose for the transfer, at least on the Debtor's part, was to hinder, defraud or delay Walia's collection efforts.

36.     A letter dated February 28, 2000, both signed and notarized by the Debtor, references his previous resignation as an officer of RPC and transference of his ownership interest to Harbir Riar. The letter also attaches a purported letter of resignation dated December 31, 1999. Minutes of RPC's board of directors also allege the Debtor's resignation and reflect the same date.[6]

37.     On January 24, 2000, RPC entered into a new lease agreement with Getty, signed by Harbir Riar only.

38.     On March 19, 2001, Harbir Riar filed an application with Getty to become the sole operator of the gas station, instead of RPC. The application was notarized by the Debtor.

39.     On April 30, 2001, Harbir Riar incorporated Shan & Co. to replace RPC as the operating entity for the gas station. Mr. Riar then entered into a new lease agreement with Getty in the name of Shan & Co. on May 16, 2001.

---

[5]     No proof of the $7,000 payment is before the Court. At trial, both Walia and the Debtor agreed that a payment of $5,000 to $10,000 was made in cash.

[6]     Based upon Debtor's scheme and the numerous inconsistencies in the record, these documents were likely dated prior to their actual creation and execution. In addition, the documents appear doctored as discussed infra.

40.     Despite this transfer, and during the relevant time period, the Debtor continued to receive the identical "salary" from RPC as he had received while he owned an interest in the company. These payments continued until two days after the instant bankruptcy petition was filed.

41.     The commission checks from Getty continued to be made out to the Debtor as well as Harbir Riar.

42.     In addition, the Debtor's signature appeared on a transfer of securities form by and between Harbir Riar, on behalf of RPC, and Getty in May of 2001.

43.     Walia requested production of income tax returns for RPC from both the Debtor and Harbir Riar. The produced returns are not identical. None of the RPC tax returns is signed.

44.     The 2001 RPC tax return produced by the Debtor lists Harbir Riar as 100% owner of RPC.

45.     The 2001 RPC tax return produced by Harbir Riar lists his ownership interest as only 50%.

46.     The 2000 RPC tax return produced by Harbir Riar lists the Debtor as an owner of RPC, despite his alleged resignation in 1999.

47.     The Debtor's personal tax returns conflict.

48.     Both the Debtor's 2000 and 2001 tax returns state that he received $48,000 in non-employee compensation from RPC yet the Debtor's 2001 tax return attaches a profit and loss statement of RPC.

## II.

The procedural history of this case occurred as follows.  Singh and his wife filed a voluntary Chapter 13 case on October 3, 2002, that was subsequently converted to a Chapter 7 case by Order

entered on April 24, 2003.  On November 20, 2003, Walia instituted an adversary action naming Singh.  Walia challenged the dischargeability of the debt arising from the loan made to Singh, alleging a fraudulent conveyance pertaining to the transfer of Singh's former 50% ownership interest in RPC to Riar.

Singh answered the complaint (and amended complaint) alleging various affirmative defenses, including lack of standing (Rec. on App. No. 03-2810, Docket No. 5 at pp. 7-8; Docket No. 23 at p.13).  On June 25, 2004, the Chapter 7 Trustee determined that Singh's estate had no assets and filed a document entitled "Report of No Distribution" and requested to be discharged (Rec. on App., document dated 6/25/2004).  The Trustee did not challenge Walia's claim as a secured creditor.  On March 9, 2005, Walia filed a motion seeking derivative authority to file the suit, but withdrew the motion the very same day without stating a reason.

On March 17, 2005, Singh filed a motion to dismiss Walia's adversary action for lack of standing to pursue fraudulent conveyance claims on behalf of the bankruptcy estate or for his own benefit (Rec. on App. No. 03-2810, Docket No. 49).  The Trustee took no position with regard to the motion to dismiss.  The Bankruptcy Court issued its First Opinion, declaring the need for a hearing to determine whether Walia's claim was secured or unsecured in order to determine several issues, and thus mooted the motion to dismiss and set forth a hearing schedule.  The Bankruptcy Court's interlocutory ruling also joined the Trustee as a party in interest who may pursue an avoidance if the claim was deemed unsecured. By the same Order, the Bankruptcy Court held that the two-year statute of limitations on the Trustee's avoidance powers would be equitably tolled (Rec. on App. No. 03-281, Docket No. 54).  By order entered on December 21, 2005, the Bankruptcy Court vacated the automatic stay to permit Walia to preserve his state law remedies against Singh and Riar if his claims

8

were deemed secured (Rec. on App. Docket No. 59).   On December 28, 2005, Walia filed a complaint against Singh and Riar in New Jersey Superior Court.

On December 7, 2006, the Bankruptcy Court held a hearing on the remaining issues – to determine the status of Walia's security interest, whether Singh was entitled to receive a bankruptcy discharge, and whether Singh's debt to Walia should be declared nondischargeable.   Riar contends that although she was notified of the hearing (Rec. on App. Docket No. 76), the Trustee did not appear.   The Bankruptcy Court issued its Second Opinion (1) rejecting Walia's security interest and concluding that he was an unsecured creditor under the UCC because the stock which Singh had used to grant Walia a security interest did not exist; (2) finding that Walia had not met his burden to sustain a ruling of nondischargeability as to his claims; (3) denying Singh's bankruptcy discharge due to his fraudulent conduct; and (4) directing that the Trustee investigate the fraudulent conveyance claims initially asserted by Walia against Singh.   Appellants subsequently brought this appeal.

III.

This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 158(a)(1).  "On an appeal the district court . . . may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings.   Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses." *Fed. R. Bankr. P. 8013.*   A Bankruptcy Judge's factual finding is considered to be clearly erroneous "when 'the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Schlumberger Res. Mgmt. Servs. v. CellNet Data Sys.* (In re CellNet Data Sys.),

327 F.3d 242 244 (3d Cir. 2003) (citations omitted).  A Bankruptcy Court's legal conclusions, however "are subject to the district court's plenary review." *J.P. Fyfe, Inc. v. Bradco Supply Corp.*, 891 F.2d 66, 69 (3d Cir. 1989).  If a decision involves mixed questions of law and fact, the Court utilizes a "mixed standard of review.  We accept the trial court's finding of historical or narrative facts unless clearly erroneous, but exercise 'plenary review of the trial court's choice and interpretation of legal precepts and its application of those precepts to the historical facts.'" *Mellon Bank, N.A. v. Metro Communications, Inc.*, 945 F.2d 635, 642 (3d Cir. 1991) (citations omitted). Additionally, a Bankruptcy Court's exercises of discretion are reviewed by this Court using an abuse of discretion standard.  *Kool, Mann, Coffee & Co. v. Coffey*, 300 F.3d 340, 353 (3d Cir. 2002).  An abuse of discretion "can occur 'if the judge fails to apply the proper legal standard or to follow proper procedures in making the determination, or bases an award upon findings of fact that are clearly erroneous.'" *Zolfo, Cooper & Co. v. Sunbeam-Oster Co.*, 50 F.3d 253, 257 (3d Cir. 1995).

IV.

As noted above, Singh moved to dismiss the contested action filed by Walia due to a lack of standing.  Singh argued that Walia had no standing as either a secured or unsecured creditor, and as a result Walia's actions must be dismissed.  Interestingly, the Bankruptcy Judge agreed with Singh's legal position that Walia had no standing; but instead of dismissing the matter as Singh desired, the Bankruptcy Judge substituted in the Trustee as plaintiff, and tolled the statute of limitations so that the Trustee could evaluate whether to pursue a claim against Singh. In addition, the Court denied discharge of Singh's debts due to his fraudulent actions.  Hence, the issue on appeal here is whether the Bankruptcy Judge had the authority, sua sponte, to substitute the Trustee for Walia and to toll the statute of limitations.

Generally, Bankruptcy Courts, like the District Courts, are courts of equity; their "powers of equity are codified at 11 U.S.C. § 105(a), which states that a 'court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code].'" *Cohen v. KB Mezzanine Fund II, LP* (In re SubMicron Sys. Corp.), 432 F.3d 448, 455 n.6 (3d Cir. Del. 2006). More specifically "the bankruptcy courts have broad authority to act in a manner that will prevent injustice or unfairness in the administration of bankruptcy estates. ("[I]n the exercise of its equitable jurisdiction the bankruptcy court has the power to sift the circumstances surrounding any claim to see that injustice or unfairness is not done . . . ."); ("Bankruptcy courts are courts of equity, empowered to invoke equitable principles to achieve fairness and justice in the reorganization process." (internal quotation omitted)). To this end, they may, when necessary, 'eschew[] mechanical rules,' 'modify creditor-debtor relationships,' and 'craft flexible remedies that, while not expressly authorized by the [Bankruptcy] Code, effect the result the Code was designed to obtain.'" *In re Kaiser Aluminum Corp.*, 456 F.3d 328, 340 (3d Cir. 2006) (internal citations omitted).

It should be noted, however, that this power is not unlimited. Section 105(a) "supplements courts' specifically enumerated bankruptcy powers by authorizing orders necessary or appropriate to carry out provisions of the Bankruptcy Code" but it "does not 'create substantive rights that would otherwise be unavailable under the Bankruptcy Code.'" *Joubert v. ABN Mortg. Group, Inc.* (In re Joubert), 411 F.3d 452, 455 (3d Cir. 2005) (internal citations omitted). Bankruptcy courts can "fashion such orders as are required to further the substantive provisions of the Code. Section 105(a) gives the court general equitable powers, but only insofar as those powers are applied in a manner consistent with the Code. Nor does section 105(a) give the court the power to create substantive rights that would otherwise be unavailable under the Code." *Id.* (internal citations omitted). "The

11

general grant of equitable power contained in § 105(a) cannot trump specific provisions of the Bankruptcy Code, and must be exercised within the parameters of the Code itself." *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 236 (3d Cir. 2004).

Appellants take a narrow view of the Bankruptcy Court's role in reviewing its motion to dismiss. The Bankruptcy Court employed a broader approach. Although the Bankruptcy Court agreed that Walia lacked standing, the Court also found that other jurisdictional issues beyond the scope of the motion required adjudication. Those issues hinged on whether Walia's interest was secured.

The Bankruptcy Court stated

> the status of the instant claim is a threshold determination that controls more than just the nature of the claim. It dictates what type of action the fraudulent transfer action is which in turn determines who has standing to bring the action and whether the action belongs in this Court.

(First Opinion at 10).

The broader view included, but was not limited to, a determination of whether Singh's debts were barred from being discharged due to his fraud. 28 U.S.C. §§ 727(a)(2) and (a)(3). The Bankruptcy Court found the hearing to be a "core proceeding." 28 U.S.C. §§ 157(b)(2)(I), (J), (K) and (O) (First Opinion at 2 and 4). According to the Bankruptcy Court, the proceeding was a broad one – to determine "the dischargeability of particular debts"; to hear "objections to discharges"; to determine "the validity, extent, or priority of liens"; and to determine the affect of "the adjustment of the debtor-creditor or the equity security holder relationship." 28 U.S.C. §§ 157(b)(2)(I), (J), (K) and (O). Based on the Bankruptcy Court's broad equitable powers, the Bankruptcy Court acted in a very reasonable manner in order to justly determine the case as a whole, and to make certain it

12

"maximized the value of the bankruptcy estate." *In Re G-I Holdings*, 313 B.R. 612, 627 (Bank. D.N.J. 2004).

Judge Steckroth clearly acted within his equity powers without stepping outside the boundaries of the Bankruptcy Code. He "eschewed mechanical rules" in order to prevent unfairness in this factually complicated matter, yet did not "create substantive rights that would otherwise be unavailable under the Code."

Having found that the Bankruptcy Court proceeded reasonably, the issue of whether the Bankruptcy Court had the authority to substitute the Trustee for Walia, and toll the statute of limitations, must be addressed. The Court will analyze each issue separately.

The Appellants contend that there was "no basis to substitute the Trustee as the real party in interest pursuant to Fed. R. Bank. 7017(a) since the statute of limitations for the Trustee to bring an avoidance action expired." (First Opinion at 3). More particularly, "the Trustee's filing of a Report of No Distribution is a determination that the assets sought to be recovered by plaintiff do not constitute property by the Debtor's Estate, and thus this Court lacks jurisdiction." (First Opinion at 3).

The Appellants agree with the Bankruptcy Court that only the Trustee may sue to avoid a transfer so long as the transfer in question is by a creditor holding an unsecured claim. The statute reads in pertinent part:

> "the *trustee* may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an *unsecured claim* that is allowable under section 502 of this title.

11 U.S.C. § 544(b)(1) (emphasis added).  The Court found that this makes sense because the Trustee, the sole party named in the statute – "has a unique role in bankruptcy proceedings", and "Congress wanted to grant unique and exclusive powers to the Trustee."  (First Opinion at 7).

Federal Rule of Civil Procedure 17(a) states that a civil action "must be prosecuted in the name of the real party in interest."  Subsection (a)(3) says that a court "may not dismiss an action for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action. After ratification, joinder, or substitution, the action proceeds as if it had been originally commenced by the real party in interest." Rule 17(a) is incorporated into the bankruptcy rules under Federal Rule of Bankruptcy Procedure 7017.  *Fed. R. Bank. P. 7017.*  "The Advisory Committee's note to Rule 17(a) states that the rule is 'intended to prevent forfeiture when determination of the proper party to sue is difficult or when an understandable mistake has been made.' Fed. R. Civ. P. 17(a) advisory committee's note."  *Lans v. Gateway 2000, Inc.*, 84 F. Supp. 2d 112, 120 (D.D.C. 1999) (the rule allows for correction of parties and relation back to the time the action was commenced if there was "an honest mistake in choosing the nominal plaintiff, meaning that determination of the proper party was somehow difficult at the time of the filing of the suit, or that the mistake is otherwise understandable."); *Weiburg v. GTE Southwest, Inc.*, 272 F.3d 302, 308 (5th Cir. 2001); 6A Wright & Miller, Federal Practice and Procedure § 1555.

Judge Steckroth, in the First Opinion, notes that "the Trustee, based upon the secured claim as asserted by [Walia], had obvious reason to believe the avoidance of any transfer would not benefit the estate.  This is because [Walia's] assertion of a secured claim masked the true nature of the claim (if it is unsecured), and thus affected the Trustee's analysis."  (First Opinion at 11).  The Bankruptcy

14

Court found that the Trustee was misled by virtue of Walia's claim. It is apparent that it was unclear whether Walia's claim was secured or unsecured – "determination of the proper party was somehow difficult at the time of the filing of suit" due to the issue of whether Walia was a secured or unsecured creditor. Under the peculiar circumstances of this case, the Bankruptcy Court's finding that the Trustee was misled is a reasonable conclusion, and substituting the Trustee for Walia fits the circumstances.

The Court finds that, given the convoluted factual scenario presented by this case and the already unclear nature of Walia's claim, that Judge Steckroth appropriately allowed the Trustee to join the action pending the outcome of his hearing on the nature of Walia's claim. Judge Steckroth's exercise of his powers of equity did not constitute an abuse of discretion as this Court is hard-pressed to find that the Judge failed to apply the proper legal standard or procedures or based his relief on clearly erroneous factual findings. *Zolfo, Cooper & Co. v. Sunbeam-Oster Co.*, 50 F.3d 253, 257 (3d Cir. 1995).

With regard to the Bankruptcy Court's decision to equitably toll the statute of limitations, the Court need not address this issue at length. The bankruptcy act allows the Trustee to bring an action to avoid a fraudulent transfer within two years of filing for bankruptcy 11 U.S.C. § 546(a)(1)(A). The petition was filed on October 8, 2002; accordingly, the statute ran on October 3, 2004.

It is puzzling why the Bankruptcy Court opted to invoke the doctrine of equitable tolling when it found that Rule 7017(a) applied, and substituted the Trustee as the real party in interest. Walia's complaint was filed on November 20, 2003. The Trustee's claim relates back to the filing of Walia's complaint, and it would be deemed timely filed. The Rule clearly states that "[a]fter ratification, joinder, or substitution [of the real party in interest], the action proceeds as if it had been

15

originally commenced by the real party in interest." Fed. R. Civ. Pro. 17(a)(3). Thus, by operation of the Court Rules, it is timely and unnecessary to analyze the Bankruptcy Court's findings with regard to equitable tolling because it was unnecessary to analyze same.

V.

The Bankruptcy Court acted properly and committed no error in first determining the nature of Walia's claim, and second in substituting the Trustee as the real party in interest.  The Trustee's claim would be deemed timely based on Judge Steckroth's application of Rule 7017(a), and thus the equitable tolling analysis was unnecessary.  Therefore this Court need not address the propriety of the analysis, as it was merely superfluous.  The Bankruptcy Court is hereby affirmed, and the Appellants' appeal is denied.


                                    _s/Peter G. Sheridan_____
                                    PETER G. SHERIDAN, U.S.D.J.
July 1, 2008